AO 106 (Rev. 04/10)  Application for a Search Warrant



# UNITED STATES DISTRICT COURT

for the

Southern District of California

FILED

SEP 2 6 2019

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                               DEPUTY

| In the Matter of the Search of | ) | |
|---|---|---|
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.  '19 MJ4183 |
| One (1) Huawei Phone IMEI:866440025300535; S/N: K8PDU15A31008686 Seized from Vitas GUILLAUME on September 11, 2019 | ) ) ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-3.

located in the _____Southern_____ District of _____California_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 8 USC 1324(a)(1)(A)(i) & (v)(I); 8 USC 371; 18 USC 1001(a)2); 18 USC 1001(a)(3); 18 USC 1519 | Conspiracy to Bring Certain Aliens Without Presentation; Conspiracy to Use False Documents; 1False Statements; False Documents; and Aiding and Abetting as to the Falsification of Records or Documents in a Federal Investigation |

The application is based on these facts:

See attached affidavit of Roberto Rospigliosi, HSI Special Agent

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Roberto Rospigliosi, HSI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  9/26/2019

_____
*Judge's signature*

City and state:  San Diego, California

Hon. F.A. Gossett, U.S. Magistrate Judge
*Printed name and title*

1
2

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

3        I, Roberto Rospigliosi, Special Agent with the United States Department of

4  Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland

5  Security Investigations (HSI), being duly sworn, hereby state as follows:

6                                   **INTRODUCTION**

7        1.    This affidavit supports applications for warrants to search the following cell

8  phones:

9
10

      a.    One (1) Alcatel Phone
            FCC ID: 2ACCJH007
            Seized from Nariles DOMINIQUE on September 11, 2019

11
12

            **(Target Device 1)**;

      b.    One (1) Samsung Phone
            IMEI: 359459/07/216884/7

13
14

            S/N:  RV8HC0MKHWY
            Seized from Vitas GUILLAUME on September 11, 2019

15
16

            **(Target Device 2)**;

      c.    One (1) Huawei Phone

17
18

            IMEI:866440025300535
            S/N:  K8PDU15A31008686
            Seized from Vitas GUILLAUME on September 11, 2019

19
20

            **(Target Device 3)**;

      d.    One (1) HTC Phone

21

            IMEI: 358703045828958
            S/N: SH1CYVN05708

22
23

            Seized from Vitas GUILLAUME on September 11, 2019
            **(Target Device 4)**;

24
25

      e.    One (1) Samsung Phone
            IMEI: 358506077552481
            S/N: RQ8JC0BTHXZ

26
27

            Seized from Kervins LUMA on September 11, 2019
            **(Target Device 5)**;

28

      f.    One (1) ZTE Phone
            IMEI: 860926039231068

S/N: 329766744506
Seized from Aubens MONFORT on September 11, 2019
(**Target Device 6**); and

g.     One (1) Huawei Phone
IMEI: 868354030456497
S/N: BEG9K18427901913
Seized from Edner JOSEPH on September 11, 2019
(**Target Device 7**)

collectively referred to herein as the **Target Devices**, as described in Attachments A-1 through A-7 (incorporated herein by reference), and to seize evidence of crimes and property used in the commission of crimes, specifically, violations of 8 U.S.C. § 1324(a)(1)(A)(i) and (v)(I) – Conspiracy to Bring Certain Aliens Without Presentation; 8 U.S.C. § 371 – Conspiracy to Use False Documents; 18 U.S.C. § 1001(a)(2) – False Statements; 18 U.S.C. § 1001(a)(3) – False Documents; and 18 U.S.C. §§ 1519 and 2 – Aiding and Abetting as to the Falsification of Records or Documents in a Federal Investigation, as further described in Attachment B.

2.     The requested warrants relate to the investigation and prosecution of Nariles DOMINIQUE (DOMINIQUE), Vitas GUILLAUME (GUILLAUME), Kervins LUMA (LUMA), Aubens MONFORT (MONFORT), Edner JOSEPH (JOSEPH) and Mocles ESTRILUS (ESTRILUS), all of whom entered the United States from Mexico illegally on September 10, 2019 and claimed false familial relationships to avoid further detention by immigration authorities.   *See United States v. Guillaume and Dominique*, 19MJ3964; *United States v. Monfort and Luma*, 19MJ3924; *United States v. Estilus*, 19MJ3931 and *United States v. Joseph*, 19MJ3930 (material witness complaint). The **Target Devices** are currently in the possession of the Department of Homeland Security and are presently stored at 2297 Niels Bohr Court, San Diego, CA 92154.

3.     The information contained in this affidavit is based upon my training, experience, investigation, and consultation with other members of law enforcement. Because this affidavit is made for the limited purpose of obtaining a search warrant for the

1  **Target Devices**, it does not contain all the information known by me or other agents
2  regarding this investigation. All dates and times described are approximate.

3  **EXPERIENCE AND TRAINING**

4       4.    I am a Special Agent (SA) with Homeland Security Investigations since
5  November 2010. I currently am assigned to the Document and Benefit Fraud Task Force,
6  where my duties include investigating fraudulent applications for immigration benefits, the
7  manufacture and sale of fraudulent immigration documents, and financial exploitation of
8  immigrants.

9       5.    I am a graduate of the Federal Law Enforcement Training Center, Brunswick,
10 Georgia, having successfully completing the required coursework. I am also a graduate of
11 the Federal Criminal Investigator Training Program (CITP) and the Immigration and
12 Customs Enforcement Special Agent Training (ICESAT) academies.

13      6.    As a Special Agent, my primary duties include the investigation of criminal
14 immigration-related violations under Title 8 of the United States Code and identity fraud-
15 related investigations under Title 18 of the United States Code. I have spoken with other
16 agents with extensive experience in human smuggling and identity fraud-related
17 investigations. I have arrested or participated in the arrest of persons for violations under
18 Titles 8 and 18 of the United States Code. I have conducted interviews with arrested
19 persons and their associates, as well as cooperating individuals and informants. I have
20 conducted surveillance of individuals involved in human smuggling and illegal re-entries,
21 and individuals suspected of identity fraud while operating inside the United States.
22 Through these investigative activities, I have gained a working knowledge and insight into
23 the typical activity of individuals attempting to circumvent the United States' immigration
24 laws by avoiding apprehension or maintaining a presence in the United States without
25 detection.

26      7.    Since May 2011, I have been involved in the investigations of fraud and
27 smuggling related apprehensions near the international border between the United States
28 and Mexico. My current assignment is part of what is known as the Southwest Border

3

1 Surge Initiative.   My duties include taking sworn statements from defendants, other
2 individuals without legal status apprehended as part of a group near the border, and children
3 where possible; preparing reports for criminal and administrative cases; collecting
4 evidence; seizing personal property; and creating intelligence reports.

5         8.     Generally and subject to certain exceptions, when an adult without legal status
6 is apprehended for an illegal entry but has her or his minor child present, this adult may be
7 released from immigration custody or not subject to criminal prosecution in order to avoid
8 separation from the child.   Subject to certain exceptions, when an unaccompanied minor
9 (i.e., a minor without legal status and who is not with a parent or guardian) is apprehended
10 for an illegal entry, that unaccompanied minor eventually is released from immigration
11 custody or not subject to criminal prosecution.   During my current assignment as part of
12 the Southwest Border Surge Initiative, I have been tasked with investigating whether
13 individuals without legal status are making fraudulent claims about: (1) their status as a
14 parent to a purported minor child who is with them; or, (2) their status as a minor.   These
15 claims are made in order to avoid extended detention at immigration facilities or criminal
16 prosecution.   During interviews, individuals who admit to the false claims explain how
17 human smugglers or other individuals without legal status told them to make these false
18 claims in order to gain entry into the United States.

19         9.     Through the course of my training, investigations, and conversations with
20 other law enforcement personnel, defendants, and smuggled humans, I am aware that it is
21 a common practice for: (a) human smugglers to work in concert with other individuals and
22 to do so by utilizing cellular telephones, and portable radios to maintain communications
23 with co-conspirators in order to further their criminal activities; (b) the smuggled aliens to
24 communicate with the human smugglers or a go-between by utilizing cellular telephones
25 in order to further their illegal entry into the United States; (c) the smuggled aliens will
26 have information stored on their cellular telephones that show their true identity including
27 name, nicknames, date of birth, home, school or work addresses and descriptions, familial
28 associations; and (d) smuggled aliens, if relying on false statements or documents about

being in a parent-minor child relationship or being an unaccompanied minor in an attempt to gain entry into the United States and/or to avoid further detention or criminal prosecution, will have information stored on their cellular telephones that show the gathering of information to support these false statements or documents. Conspiracies as to the smuggling and trafficking of undocumented aliens generate many types of evidence including, but not limited to, cellular phone-related evidence such as voicemail messages referring to the method and manner of the smuggling venture, arrangements of travel and payment, names, photographs, text messaging (via SMS or other applications), and phone numbers of co-conspirators. I also know that human smugglers often use fraudulent information to subscribe to communication facilities, especially cellular telephones, and frequently change communications facilities to thwart law enforcement efforts to intercept their communications.

10. In preparing this affidavit, I have conferred with other agents and law enforcement personnel who are experienced in the area of human smuggling investigations, and the opinions stated below are shared by them. Further, I have personal knowledge of the following facts, or have had them related to me by persons mentioned in this affidavit.

a. Human smugglers and smuggled aliens use "digital devices," including cellular telephones and smart electronic devices with messaging applications because these devices are mobile. In addition, these devices allow smugglers and smuggled aliens to have instant access to telephone calls, instant messaging, text messaging, social media applications, and voice messaging.

b. Human smugglers and smuggled aliens use their cellular telephones and smart electronic devices to communicate amongst each other to coordinate the logistics and payments related to the smuggling of the undocumented aliens into the United States and from thereon. Regarding the logistics, the smuggling method may include obtaining, making, altering, or using what appear to be official birth records from a foreign country to show a parent-minor child relationship between smuggled aliens or that a smuggled alien

1  is an unaccompanied minor in order to avoid further detention or criminal prosecution after

2  apprehension by immigration authorities such as Border Patrol Agents.

3          c.     An undocumented alien or someone closely associated with this

4  undocumented alien may make contact using their cellular phones or smart electronic

5  devices with an initial human smuggler while the undocumented alien is outside of the

6  United States.  They will discuss over the phone or via a messaging application about the

7  logistics as to how to smuggle this undocumented alien into the United States (such as

8  using false documents) and the financial payments involved with the smuggling act.  Using

9  the phone or a messaging application on the phone, this smuggler will work with other

10  associates to coordinate how to smuggle this undocumented alien along with the financial

11  payments.  Using the phone itself or a messaging application on their phone, the smuggler

12  or associates will advise the undocumented alien or the close contact to the undocumented

13  alien about the next steps including the meet-up point.  Using the phone or messaging

14  application, they may discuss the method, manner and payment at that time or after

15  successfully smuggling the undocumented alien into the United States.

16          d.     The undocumented aliens also will use their phones to make calls or

17  send text messages to discuss the smuggling arrangements with the smugglers themselves,

18  or a go-between such as a family member or close friend prior to and during the smuggling

19  event.  On making their illegal entry into the United States, the smuggled aliens may use

20  their phones to continue to communicate with the smugglers or the go-between such as a

21  family member or close friend to discuss the manner and method of the smuggling activity

22  including the payment.

23          e.     Subscriber Identity Module (SIM) cards also known as subscriber

24  identity modules are smart cards that store data for certain cellular telephone

25  subscribers.  Such data includes user identity, phone number, network authorization data,

26  personal security keys, contact lists, and stored text messages.  Dependent on the cellular

27  device, information on a SIM cards can be collected as evidence as to the operator use of

28  that particular cellular telephone.  SIM cards may be transferrable between different

1  cellular/mobile telephones.  Human smugglers and their co-conspirators sometimes will

2  replace the SIM (memory) cards in their cellular or mobile phones as a means to avoid

3  detection.

4          f.      Undocumented aliens are like anyone else who has friends and family.

5  They will use social media accounts such as Facebook to update family and friends to

6  discuss their whereabouts, daily activities or travels as they make their way to the United

7  States. They may use messaging applications such as Facebook Messenger to do the same

8  or the coordinate with the human smugglers.  The undocumented aliens may share

9  photographs of themselves or where they are located.  In order to register their accounts,

10  they will input a name, e-mail address and date of birth and decide how much information

11  to keep public or private from the general public.  At the time of their apprehensions,

12  undocumented aliens who use false documents or make false claims about their identity or

13  family relationships to immigration authorities may still maintain their social media

14  accounts that contain their true name, dates of birth and other personal information about

15  their home, work or social activities as well as photographs of themselves and their daily

16  activities.

17          11.     Based upon my training and experience, consultations with law enforcement

18  officers experienced in human smuggling investigations, and all the facts and opinions set

19  forth in this affidavit, I know that cellular/mobile telephones, and SIM cards may and often

20  do contain electronic records, phone logs and contacts, voice and text communications,

21  and data such as emails, text messages, chats and chat logs from various third-party

22  applications, photographs, audio files, videos, and location data.  This information can be

23  stored within disks, memory cards, deleted data, remnant data, slack space, and temporary

24  or permanent files contained on or in the cellular/mobile telephones.

25

26

27

28

1
### FACTS SUPPORTING PROBABLE CAUSE

2      12.    On September 10, 2019, at approximately 11:00 p.m., Border Patrol Agents
3  apprehended a group of individuals without legal status who just crossed into the U.S.  The
4  apprehension occurred in an area approximately 0.75 miles west of the Tecate, California
5  port of entry and approximately 100 feet north of the border between Mexico and the
6  United States.

7      13.    In this group, there were six individuals who claimed to have father-minor son
8  relationships: Vitas GUILLAUME as father to Nariles DOMINIQUE (under the name
9  Nariles Guillaume); Edner JOSEPH as father to Mocles ESTILUS (under the name Junior
10 Joseph); and, Aubens MONFORT as father to Kervins LUMA (under the name Sonson
11 Monfort). All claimed to be citizens and nationals from Haiti. None of them possessed the
12 necessary documentation to enter or remain in the United States legally.  On apprehension,
13 the members of the group were transferred to the Brown Field Border Patrol Station in San
14 Diego, CA for processing.

15 ## Vitas GUILLAUME and Nariles DOMINIQUE:

16     14.    During initial processing, Nariles DOMINIQUE presented what purported to
17 be a Haitian birth record for Nariles Guillaume showing he was the minor son of Vitas
18 GUILLAUME.  The birth record showed a date of birth of May 18, 2002. DOMINIQUE
19 also told Agents that GUILLAUME was his father.

20     15.    Border Patrol Agents fingerprinted DOMINIQUE to confirm his identity.
21 DOMINIQUE also was photographed as indicated below. Biometrics revealed



22 DOMINQUE's true name as Nariles DOMINIQUE and not a Nariles
23 Guillaume as he represented himself.  The biometrics information
24 showed DOMINIQUE had a year of birth in 1994.

25
26

27     16.    A biometrics report known as BitMap also revealed Nariles DOMINIQUE
28 was encountered and fingerprinted through partner nation cooperation.  The report

reflected that DOMINIQUE was encountered and fingerprinted on April 10, 2019 in Peru. The date of birth was listed as January 6, 1994. The following photograph was included below. According to the record, DOMINIQUE had a Haitian Passport with Passport Number PP3966147.



17.   On May 13, 2019, DOMINIQUE was encountered and fingerprinted in the country of Panama and the date of birth showed January 6, 1994. The following photograph was included.



18.   On May 23, 2019, DOMINIQUE was encountered and fingerprinted in Costa Rica.   The date of birth was listed as May 18, 1994, although there was no further information as to where that information came from.   The following photograph was included..



19.   The reports showing the foreign contacts reflecting the year of birth associated with DOMINIQUE's fingerprints would make DOMINIQUE approximately 25-years-old. At the time of his arrest, DOMINIQUE also was in possession of **Target Device 1.** On that same day, Agents seized **Target Device 1** from DOMINIQUE.

20.   Special Agents (SAs) Hinckley and Abend utilized Lion Bridge translation service to interview Vitas Nariles DOMINIQUE in the Haitian Creole language. DOMINIQUE was unwilling to speak with SAs.

21.   SAs also conducted a search of DOMINIQUE's name in Facebook, revealing five Facebook accounts: www.facebook.com/nariles.dominigue - **Facebook Account 1**; www.facebook.com/dominique.nariles.3       -       **Facebook       Account       2**; www.facebook.com/aniles.dominique       –       **Facebook       Account       3**; www.facebook.com/nariles.dominigue.50,  and  www.facebook.com/nariles.dominique.3,

22.   **Facebook Account 1** - www.facebook.com/nariles.dominigue has a profile name of "Nariles Dominigue."   The account has thirty-eight profile pictures of DOMINIQUE and three videos of himself talking and singing into the camera.   In all of the pictures and videos, DOMINIQUE has long dreadlocks and facial hair.   In some photographs, his eyebrows appear to be shaven.

 

23.    **Facebook Account 2** - www.facebook.com/dominique.nariles.3 has a profile name of "Dominique Nariles". There is no biographical information listed on the account. The account has seven accounts listed as friends and there are three profile pictures posted. One of the pictures is of DOMINIQUE sitting on a couch. The second picture is of a black male on a bicycle and the third picture is of an unknown black male and a black female.



24.    **Facebook Account 3** - www.facebook.com/aniles.dominique has a profile name of "Aniles Dominique (Nariles)". The account has twenty-one pictures of DOMINIQUE. In all of the pictures, DOMINIQUE has long dreadlocks and facial hair. The account has a "Check-Ins" location of Tijuana, Baja California. The account has eight accounts listed as friends.

 

11

25. Facebook Account www.facebook.com/nariles.dominique.3 has a profile name of "Nariles Dominique" and lists the user as being from Tijuana, Baja California. There is no other biographical information visible to the public. The account does not have any profile pictures. The account has sixty-eight accounts listed as friends. In addition, Facebook Account - www.facebook.com/nariles.dominigue.50 has a profile name of "Nariles Dominigue". There are no profile pictures, no biographical information, and no accounts listed as friends.

26. During initial processing by Border Patrol, GUILLAUME told agents he was traveling with his minor son, Nariles Guillaume and that Nariles was 17-years-old. As a form of identification, GUILLAUME presented some type of identification document that appeared to be from Chile. He claimed that he had resided in Chile at one point.

27. GUILLAUME also was fingerprinted. The biometrics report known as BitMap showed GUILLAUME has an April 28, 2019 encounter in Panama; and, a May 9, 2019 encounter in Costa Rica. These dates and places do not line up with the dates and places GUILLAUMES' claimed son – Nariles Guillaume – DOMINIQUE - had contacts with foreign agency partners. In my training and experience and in discussions with other agents, parents traveling with minor child tend to stay together as much as possible so the parents can protect and watch over their children.

28. GUILLAUME also was in possession of **Target Device 2, Target Device 3, and Target Device 4** and told SAs they belonged to him. GUILLAUME told SAs **Target Device 1** belonged to DOMINIQUE. On that same day, SAs seized **Target Device 2, Target Device 3, and Target Device 4** from GUILLAUME.

29. SAs Hinckley and Abend utilized Lion Bridge translation service to interview GUILLAUME in the Haitian Creole language. GUILLAUME stated he was unwilling to speak with SAs.

30. SA Abend conducted a search of GUILLAUME's name in Facebook and discovered www.facebook.com/guillaume.vitas with a profile name of "Guillaume Vitas" and one picture of himself posted on his account's page. The account has one hundred

12

fourteen accounts listed as friends.    There is no biographical information on the profile page.

31.    On September 13, 2019, the Honorable Karen S. Crawford, U.S. Magistrate Judge in the U.S. District Court for the Southern District of California, authorized a search warrant to obtain Deoxyribonucleic Acid ("DNA") saliva samples from GUILLAUME and DOMINIQUE.    On that same day, HSI Special Agents took buccal swabs from GUILLAUME and DOMINIQUE.    While swabbing GUILLAUME, GUILLAUME spontaneously said, without prompting, that Nariles was not his son. He also said that Nariles was very ill and that DOMINIQUE's mother gave him Nariles to care for him.  He also said that he did not want to give his DNA and that he did not want to "shoot himself in the foot." He claimed that Nariles' mother had the birth record made to reflect him as the father.  He also said that, if he was sent back to Haiti, he would be killed.  Rapid DNA tests results confirmed that GUILLAUME and DOMINIQUE did not have a parent- child biological relationship.

32.    Shortly thereafter, a Complaint, charging GUILLAUME and DOMINIQUE with use of false documents under 18 U.S.C. § 1001(a)(3) was filed in the U.S. District Court for the Southern District of California.  The Honorable William V. Gallo signed the Complaint under Criminal Case Number 19MJ3964.

33.    On or about September 14, 42019, GUILLAUME and DOMINIQUE were taken to the Metropolitan Correction Center (MCC) in downtown San Diego for criminal processing.    Both initially were sent for observations at hospitals – GUILLAUME for suicide watch and DOMINIQUE because he apparently took his clothes off and ran naked in a cafeteria. GUILLAUME since has had his initial appearance. On September 18, 2019, DOMINIQUE was discharged from the hospital and sent back to the MCC San Diego.

34.    On returning DOMINIQUE back to MCC, SAs Hinckley and Kennedy learned from the contracted transported that additional items had been located in DOMINIUE's cell.  These items included razor blades and one piece of pocket trash that

13

had handwritten notes.  In September 19, 2019, Border Patrol Agent Rubens Alexandra translated the note from Haitian Creole to English as follows:

Name - Guillaume Vitas
My father's name is Gillaume Vilbrum
My mother's name is Dorvil Monlilia
I am one of 5 children, first born.
2nd born Guillaume Sterline
3rd born Guillaume (illegible)
4th born "Guillau" (illegible)
Guillaume Lorvens

In my training and experience and based on discussions with other agents familiar with identity cases, individuals will take notes on false family relationships in order to memorize or refer to these relationships when questioned by authorities.

**Aubens MONFORT and Kervins LUMA:**

35.    On September 11, 2019, during initial processing, Aubens MONFORT had what appeared to be a birth record from Haiti, showing he was the father of Sonson Monfort, a minor child of approximately 17-years-old. He identified Kervins LUMA as the owner of this birth record. LUMA also claimed he was Sonson Monfort and that he was 17-years-old. Just as with DOMINIQUE, Border Patrol Agents had discovered another record for LUMA and confronted LUMA on the age discrepancy.  LUMA, however, maintained to Border Patrol Agents that he was 17 years old.

36.    On September 11, 2019, Special Agents Hinckley and Kennedy interviewed MONFORT and LUMA separately. Both MONFORT and LUMA were advised of their Miranda rights and elected to answer questions without the presence of counsel. MONFORT and LUMA were also advised that making false statements to a federal officer was a crime.  During the interviews, MONFORT stated he was the adoptive father of Sonson Monfort, the 17-year-old son, and that they travelled together from Haiti to the United States.

37. LUMA admitted to SAs his true name and age (approximately 26-years-old). LUMA, however, insisted he was the adopted adult son of MONFORT. He claimed he was brought into Mexico against his will. LUMA, however, admitted that he received an email containing the fraudulent birth certificate using the name Sonson Monfort and stated he has never heard of that name. Post-Miranda, LUMA consented to a search of his phone, **Target Device 5**. On review of the phone, Agents located a photo file matching the falsified birth record presented to Border Patrol Agents belonging to Sonson Monfort, the 17-year-old and listing MONFORT as the father. On that same day, Agents seized **Target Device 5** from LUMA.

38. SAs conducted a search of LUMA's name in Facebook, revealing account https://www.facebook.com/luma.kervens.5. The account had a picture of LUMA on the profile page. The account had eight pictures of himself visible to the public. The account has 1087 accounts listed friends. The account did not have any biographical information listed.

39. After LUMA was interviewed, MONFORT was reinterviewed. MONFORT admitted he had no biological relationship with LUMA, and that they met in Tapachula, Chiapas, Mexico, sometime in May or June, 2019. MONFORT stated that LUMA approached him a few weeks earlier. LUMA asked MONFORT to pose as his father and LUMA would pose as his 17-year-old son in order to enter the United States. MONFORT agreed.

40. Between MONFORT and LUMA, they obtained the fraudulent birth certificate, and together they went to a cyber-café in Tijuana to print out the scanned fraudulent birth certificates. Post-Miranda, MONFORT consented to a search of his phone, **Target Device 6**. On that same day, SAs seized **Target Device 6** from MONFORT.

41. SAs conducted a search of MONFORT's name in Facebook, revealing account https://www.facebook.com/aubens.monfort. The account has a profile name of "Aubens Monfort". The account has four identical pictures of MONFORT. The account listed MONFORT as going to a school named Lycée Charles Belaire, that he lived in

Arcahaie, and he is from Carrefour, Ouest.  The account has seventy-nine accounts listed as friends.

42.     On September 13, 2019, a Complaint was filed, charging MONFORT and LUMA with making false statements, in violation of 18 U.S.C. § 1001(a)(2) under Criminal Case Number 19MJ3924 in the U.S. District Court for the Southern District of California.

**Edner JOSEPH and Mocles ESTILUS:**

43.     On September 11, 2019 at approximately 7:15 p.m., Special Agent Critten interviewed Edner JOSEPH, who also was apprehended as part of the group and had a birth record purporting to be from Haiti showing he was the father of a minor son in the group. However, according to records checks, this "minor son" was Mocles ESTILUS, an approximately 25-year-old.  JOSEPH was advised of his *Miranda* rights. He also was advised it was a federal crime to lie to agents. JOSEPH agreed to speak with SAs. JOSEPH acknowledged that he had met up with ESTILUS as part of a group at a detention center in Chiapas, Mexico. JOSEPH said that he knew ESTILUS by the nickname "Junior" but that ESTILUS was not his biological son. JOSEPH said that his group had heard from others who claimed to have been granted admission into the United States. He said those people claimed to have used counterfeit birth certificates to gain entry and that they had explained the process to subsequent travelers doing the same thing.

44.     JOSEPH said that, in Tijuana, on a Wednesday (possibly September 4, 2019), ESTILUS met with the counterfeit document producers at an unknown location in Tijuana, Mexico (while JOSEPH was at work) and paid 1,000 pesos (approximately $50 USD). JOSEPH and ESTILUS had agreed previously that they would split the cost of the document 50/50. On Sunday (possibly September 8, 2019), JOSEPH went to an unknown location in Tijuana, Mexico pick up the counterfeit document (the purported Haitian birth certificate) that ESTILUS had already paid for.  JOSEPH admitted that he presented this document to U.S. Border Patrol Agents when they arrived in the United States.

45.     JOSEPH stated that it was explained to him by the others (including ESTILUS) that the false birth certificate would allow him to be admitted into the U.S. and

1  avoid detention by purporting to be traveling with a minor son.  JOSEPH was aware that

2  all of the parties traveling together, with the exception of one mother who had her baby in

3  Mexico, were in possession of the same type of false birth records that he had used himself.

4  JOSEPH consented to a search of his phone, **Target Device 7**.  On that same day, SAs

5  seized **Target Device 7** from JOSEPH.

6        46.  During ESTILUS's interview, also on September 11, 2019, before Special

7  Agents, ESTILUS stated his name was Junior JOSEPH and he was the son of JOSEPH.

8  ESTILUS also signed a Miranda waiver of rights form using the alias "Junior."

9        47.  In a later interview on September 12, 2019 and after being re-Mirandized and

10  reminded that making a false statement is a crime, Special Agents confronted ESTILUS

11  with JOSEPH's denial that they had a father-son relationship.  ESTILUS then admitted he

12  has no familial or biological relationship with JOSEPH.  He said that they formally met in

13  Mexico on their way to the United States.  ESTILUS stated his true name was Mocles

14  ESTILUS and his year of birth was in 1994.

15        48.  ESTILUS did not have a phone on him at the time of his arrest.  A search of

16  ESTILUS' name on Facebook revealed accounts www.facebook.com/mocles.estilus.5 and

17  www.facebook.com/estilus.mocles.  Account www.facebook.com/mocles.estilus.5 has a

18  profile name of "Mocles Estilus" and one profile picture of ESTILUS on it.  The account

19  has three hundred forty-eight accounts listed as friends.  There is no biographical

20  information listed on the account.  Account www.facebook.com/estilus.mocles has a

21  profile name of "Estilus Mocles" and one profile picture of ESTILUS, the same picture

22  posted on his other account.  The account has two hundred-two accounts listed as friends.

23  There is no biographical information listed on the account.

24        49.  On September 12, 2019, JOSEPH and ESTILUS both agreed to provide their

25  DNA and signed a form documenting their consent. Rapid DNA test results for ESTILUS

26  and JOSEPH confirmed that JOSEPH and ESTILUS had no parent-child biological

27  relationship.

28

50. On September 13, 2019, a Complaint was filed, charging ESTILUS with making false statements, in violation of 18 U.S.C. § 1001(a)(2) under Criminal Case Number 19MJ3931 in the U.S. District Court for the Southern District of California. JOSEPH is a material witness to ESTILUS' case under Criminal Case Number 19MJ3931.

**Information on RASTA:**

51. During the interview with MONFORT, MONFORT stated that LUMA had a contact known to MONFORT as RASTA. MONFORT described RASTA as a Haitian male in his mid-twenties to early thirties in age, average build, and hair worn in dreadlocks. MONFORT stated that RASTA picked them up in Mexico in a blue minivan and drove them to the border. MONFORT stated that other passengers in the blue minivan included Nariles DOMINIQUE, Vitas GUILLAUME, two adult white males, and a Haitian family consisting of an adult male, adult female, and infant child.

52. When SAs reviewed DOMINIQUE's friends list on Facebook Account https://www.facebook.com/nariles.dominique.3, they discovered DOMINQUE was friends with a "Rasta Seraphin" with account www.facebook.com/rasta.seraphin.7. The male in the profile picture fit the description MONFORT gave SAs of RASTA. A search of the name "Rasta Seraphin" in Facebook revealed four accounts, www.facebook.com/rasta.seraphin.35,www.facebook.com/rasta.seraphin.9, www.facebook.com/wicknique.seraphin.1, and www.facebook.com/rasta.seraphin.

53. Account www.facebook.com/rasta.seraphin.35 has a profile name of "Rasta Seraphin". The account has nine pictures of a black male with dreadlocks and facial hair and three pictures of a black female. The account has 4,704 accounts listed as friends. The account lists "Rasta Seraphin" as working at Department of Homeland Security, having studied at Lycee Tertulien Guilbaud, and being from Miami Beach, Florida. The account has Malia Petion listed as a family member.

54. Account www.facebook.com/rasta.seraphin.9 has a profile name of "Rasta Seraphin". The account has sixteen profile pictures of the same black male from the account www.facebook.com/rasta.seraphin.35. Additionally, the account has a profile

18

1   picture of a rifle, two pistols and bullets.  The account has 4,237 accounts listed as friends.

2   The account lists that "Rasta Seraphin" as working as the Chief of Security officer at Miami

3   International Airport, living in Miami, Florida and being from Port-dePaix.

4        55.    Account www.facebook.com/wicknique.seraphin.1 has a profile name of

5   "Rasta Seraphin (Rasta Gracia)".  The account has fifty-eight profile pictures that include

6   pictures of the same black male with dreadlocks and facial hair as the previous two "Rasta

7   Seraphin" accounts.  The profile pictures also include two pictures of one hundred US

8   dollar bills and twenty US dollar bills.  The account lists "Rasta Seraphin" as working as a

9   US Citizenship and Immigration Services Immigration Officer and having studied at Lycee

10  Tertulien Guilbaud de Port de Paix, Fond Bassin Bleu, Nord-Ouest, Haiti, living in Lake

11  Park, Florida, and being from Miami Beach, Florida.  The account has 4,520 accounts listed

12  as friends.

13       56.    Account www.facebook.com/rasta.seraphin has a profile name of "Rasta

14  Searphin".  The account does not have any pictures visible to the public.  The account has

15  two hundred eleven accounts listed as friends.  The account lists "Rasta Seraphin" as

16  working as a Chief security officer at Miami International Airport, studying at Miami Dade

17  College, living in Lake Park, Florida, and being from Port-de-Paix.

18       57.    Given the facts surrounding the arrest of the six individuals listed above, and

19  based upon my experience and training, as well as consultation with other law enforcement

20  officers experienced in human smuggling investigations, I submit that there is probable

21  cause to believe that information relevant to the smuggling activities of DOMINIQUE,

22  ESTILUS, GUILLAUME, JOSEPH, LUMA, MONFORT, RASTA and co-conspirators,

23  including the logistics of traveling from their country of origin through Mexico into the

24  United States, information about their respective true and false identities, and the

25  circumstances surrounding the producing and obtaining the false birth records, will be

26  found in the **Target Devices**.  Such evidence could be in the form of communications,

27  records, data (including but not limited to emails, text messages, other social messaging

28  applications), photographs, audio files, videos, or location data.

58.     I believe that the appropriate date range for the search of the **Target Devices** is: from April 1, 2019 through September 13, 2019 for **Target Phones 1, 2, 3, and 4** given available records indicate DOMINIQUE had contacts in other foreign countries beginning around April 10, 2019 and, if he was the minor son of GUILLAUME, they would have been traveling together up until their arrest; from May 1, 2019 through September 13, 2019 for **Target Devices 5 and 6** given MONFORT's statements that he first met LUMA sometime in May or June 2019 and they coordinated the planning and purchase of the false birth records in the days leading up to their arrest; and, from September 1, 2019 through September 13, 2019 for **Target Device 7** given JOSEPH's statements that ESTILUS went to obtain the false birth record sometime around September 4, 2019 and they coordinated the planning and purchase of the false birth records and their illegal entry in the days leading up to their arrest.

## METHODOLOGY ON CELL PHONES

59.     It is not possible to determine, merely by knowing the cellular/mobile telephone's make, model and/or serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device.  Cellular/mobile devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing.  An increasing number of cellular/mobile service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device.  For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network.  Unlike typical computers, many cellular/mobile telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device.  Current technology provides some solutions for acquiring some of the data stored in some cellular/mobile telephone

models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

60. Following the issuance of this warrant, I will collect the subject cellular/mobile telephones and subject them to analysis. All forensic analysis of the data contained within the telephones and their memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

61. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

## CONCLUSION

62. Based on all of the facts and circumstances described above, there is probable cause to conclude that DOMINIQUE, ESTILUS, GUILLAUME, JOSEPH, LUMA, and MONFORT used the **Target Devices** to facilitate violations of 8 U.S.C. § 1324(a)(1)(A)(i) and (v)(I) – Conspiracy to Bring Certain Aliens Without Presentation; 18 U.S.C. § 371 – Conspiracy to Use False Documents; 18 U.S.C. § 1001(a)(2) – False Statements; 18 U.S.C. § 1001(a)(3) – False Documents; and 18 U.S.C. §§ 1519 and 2 – Aiding and Abetting as to the Falsification of Records or Documents in a Federal Investigation.

63. Because the **Target Devices** were promptly seized during the investigation of DOMINIQUE, ESTILUS, GUILLAUME, JOSEPH, LUMA, and MONFORT's illegal entry and false representation activities and have been securely stored, there is probable cause to believe that evidence of illegal activities committed by DOMINIQUE, ESTILUS,

1 | GUILLAUME, JOSEPH, LUMA, and MONFORT and others continues to exist on the
2 | **Target Devices**.

3 |     64.    WHEREFORE, I request that the court issue a warrant authorizing law
4 | enforcement agents and/or other federal and state law enforcement officers to search the
5 | items described in Attachments A-1 through A-7, and seize the items listed in Attachment
6 | B, using the methodology described above.

I swear the foregoing is true and correct to the best of my knowledge and belief.

Respectfully submitted,

Special Agent Roberto Rospigliosi
Homeland Security Investigations

Subscribed and sworn to before me on September __26__, 2019

THE HONORABLE F. A. GOSSETT
UNITED STATES MAGISTRATE JUDGE

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# ATTACHMENT A-3

## PROPERTY TO BE SEARCHED

**Target Phone 3**

> One (1) Huawei Phone
> IMEI:866440025300535
> S/N:  K8PDU15A31008686
> Seized from Vitas GUILLAUME on September 11, 2019

Currently in the possession of the United States Department of Homeland Security, Immigration & Customs Enforcement, Homeland Security Investigations, 2256 Niels Bohr Court, San Diego, CA 92154.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ATTACHMENT B**

ITEMS TO BE SEIZED

Authorization to search the **Target Phones 1 through 7** – collectively, **the Target Devices** - includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the **Target Devices** for evidence described below.  The seizure and search of the **Target Devices**, will be conducted in accordance with the affidavit submitted in support of the warrant.

The evidence to be seized from the **Target Devices** will be electronic records, communications, and data such as emails, text messages, photographs, audio files, videos, and location data for the period from: April 1, 2019 through September 13, 2019 for **Target Phones 1, 2, 3, and 4**, May 1, 2019 through September 13, 2019 for **Target Devices 5 and 6**; and, September 1, 2019 through September 13, 2019 for **Target Device 7:**

     a.    tending to identify the travel from the country of origin through Mexico into the United States and then to the final destination within the United States; and the smuggling method including the obtaining, making, altering, or using what appear to be official birth records from a foreign country to show a parent-minor child relationship in order to avoid detention or criminal prosecution in the United States;

     b.    tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the travel from the country of origin through Mexico into the United States and then to the final destination within the United States; and, the smuggling method including the obtaining, making, altering, or using what appear to be official birth records from a foreign country to show a parent-minor child relationship in order to avoid detention or criminal prosecution in the United States;

     c.    tending to identify co-conspirators, criminal associates, or others involved in the travel from the country of origin through Mexico into the United States

30

and then to the final destination within the United States; and the smuggling method including the obtaining, making, altering, or using what appear to be official birth records from a foreign country to show a parent-minor child relationship in order to avoid detention or criminal prosecution in the United States;

d.   tending to identify travel to or presence at locations such as stash houses, ports of call, launch bays, or delivery points involved in the travel from the country of origin through Mexico into the United States and then to the final destination within the United States; and the smuggling method including the obtaining, making, altering, or using what appear to be official birth records from a foreign country to show a parent-minor child relationship in order to avoid detention or criminal prosecution in the United States;

e.   tending to identify the user of, or persons with control over or access to, the subject telephones; and/or

f.   tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above; and

g.   tending to identify method, and manner of payment for travel from the country of origin through Mexico into the United States and then to the final destination within the United States; and the smuggling method including the obtaining, making, altering, or using what appear to be official birth records from a foreign country to show a parent-minor child relationship in order to avoid detention or criminal prosecution in the United States;

h.   tending to provide the true names, aliases used, dates of birth, home, school, and work addresses and information, and familial relationships for Nariles Dominique, Mocles Estilus, Vita Guillaume, Edner Joseph, Kervins Luma, Aubens Monfort, and Rasta;

1
2
3
4
     i.     tending to support or contradict the statements provided by Nariles Dominique, Mocles Estilus, Vita Guillaume, Edner Joseph, Kervins Luma, and, Aubens Monfort to Border Patrol Agents and Special Agents with Homeland Security Investigations between September 10 and 13, 2019,

5 which are evidence of crimes and property used in the commission of crimes of violations
6 of 8 U.S.C. § 1324(a)(1)(A)(i) and (v)(I) – Conspiracy to Bring Certain Aliens Without
7 Presentation; 18 U.S.C. § 371 – Conspiracy to Use False Documents; 18 U.S.C. §
8 1001(a)(2) – False Statements; 18 U.S.C. § 1001(a)(3) – False Documents; and 18 U.S.C.
9 §§ 1519 and 2 – Aiding and Abetting as to the Falsification of Records or Documents in a
10 Federal Investigation.

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28